IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    vs.<br><br>CONNIE ESTRELLA MORENO,<br><br>        Defendant. | **8:18CR258**<br><br>**FINDINGS AND RECOMMENDATION** |

        This matter is before the Court on Defendant's Motion to Suppress Evidence (Filing No. 20).  Defendant requests an order suppressing all evidence obtained as a result of her stop, arrest and search by law enforcement on September 13, 2018.  An evidentiary hearing was held on February 8, 2019.  A transcript of the proceedings was filed on February 20, 2019.  (Filing No. 34.)  Thus, this matter is now ripe for disposition.

        For the reasons explained below, the undersigned will recommend that the motion be granted.

## FACTS

        On September 13, 2018, Trooper Brandon Wilkie ("Wilkie") and Sgt. Thomas Meola ("Meola"), officers with Nebraska State Patrol interdiction unit, were conducting surveillance at the Trailways bus station in Omaha, Nebraska.[1]  (TR. 7; TR. 21.)  The officers were looking for criminal activity, weapons, or drugs.  (TR 8.)  Typically, what is found at the bus station is drugs.  (TR. 8.)  The officers were dressed in plainclothes and were carrying concealed firearms.  (TR. 7; TR. 22.)  Meola was equipped with a body camera on his left shoulder.  (TR. 22.)

---

[1] This station was formerly a Greyhound bus station.  In the transcript, witnesses sometimes refer to it as the Greyhound bus station.

Wilkie has been a trooper with the Nebraska State Patrol ("NSP") for twelve years. (TR. 6.) Wilkie performs traffic interdiction on a weekly basis. (TR. 6.) He occasionally participates in criminal interdictions at transportation hubs. (TR. 6-7.) Meola has worked for the NSP since 1994. (TR. 19.) Meola was on the FBI's joint terrorism task force for five years, and he has been to a number of different trainings for interdiction work. (TR. 19-20.) Meola has also received counter-terrorism training. (TR. 36.) He currently supervises the DEA task force out of the DEA office in Omaha, Nebraska. (TR. 20.) Meola testified that he is involved in approximately eighty to one-hundred interdiction cases per year. (TR. 20.) Before working for the NSP, Meola was a correctional specialist at Lancaster County Corrections in Lincoln, Nebraska. (TR. 19.)

While at the Trailways bus station on September 13, 2018, Meola observed a black, hard-sided suitcase in the baggage cargo area on a bus that had arrived from Denver, Colorado. (TR. 24.) His attention was drawn to the bag because it appeared to be new and did not have personally identifiable information. (TR. 8-9.) Meola testified that bags typically have two tags, but this particular bag only had a tag printed by the bus station which indicated the bag was checked in Denver.[2] (TR. 9; TR. 24; TR. 30-31.) The bag tag had the owner's name on it, but did not list the address or telephone number of the owner. (TR. 8-9; TR. 30-31.) The numbers listed on the bus tag were all the same, so it appeared to officers that it was not a valid telephone number. (TR. 25.) Meola testified that he thought this was suspicious because bags usually have tags with telephone numbers so they can be returned to owners if they get lost. (TR. 25.) Meola stated that he has seen individuals place limited information or fake telephone numbers on bags to prevent them from being identified as the owner. (TR. 25.)

Wilkie attempted to identify the owner of the bag as passengers boarded the bus to Chicago. (TR. 10.) He began asking passengers if the bag belonged to them. (TR. 10.) Defendant claimed the bag. (TR. 10.) Wilkie then identified himself as law enforcement and explained to Defendant that he was at the bus station conducting security and looking for criminal activity. (TR. 11.) Wilkie never told Defendant she did not have to talk to him or that she was free to leave. (TR. 13-13.) Wilkie asked Defendant where she was coming from. (TR. 11.) Defendant told him that she

---

[2] Meola could not recall the destination city listed on the bag's tag. (TR. 25.)

2

was coming from Las Vegas and headed to New York. (TR. 11.) Defendant produced her ticket, which indicated she was traveling from Denver to Chicago.[3] (TR. 11.) As they were speaking, Wilkie did not raise his voice, block Defendant's ability to move, pull out his firearm, or tell Defendant she had to stay. (TR. 13.) Wilkie testified that Defendant was cooperative and answered all of his questions. (TR. 14-15.)

Wilkie asked Defendant if he could search her bags and Defendant agreed. (TR. 11.) Wilkie testified that he requested to search her bags because Defendant's hands were shaking when she handed him her ticket and because Defendant indicated she was traveling from a distribution hub for narcotics. (TR. 11-12.) Wilkie was also suspicious of criminal activity because Defendant's ticket did not match her stated travel plans. (TR. 12.)

As Wilkie searched Defendant's suitcase, Meola started speaking to Defendant and began searching one of Defendant's other bags. (Ex. 1; TR. 13.) Meola stated that he was suspicious that Defendant was engaged in criminal activity because the bag indicated it was coming from Denver, but Defendant said she was traveling from Las Vegas. (TR. 28.) Meloa questioned Defendant more about her travel plans. Meloa testified he believed Defendant when she said she was coming from Las Vegas. (TR. 28.) Meola testified that, if Defendant was coming from Las Vegas, she was reclaiming and rechecking her bag at every bus stop along the way. (TR. 28.) Meola testified that in his experience, he has seen people engaging in this behavior when they want to keep their bags in their possession and not let them out of their sight. (TR. 29.) Meola testified that law enforcement sees this behavior a couple times per month in bags that contain contraband. (TR. 29-30.) No contraband was found in Defendant's suitcase or bags. (Ex. 1; TR. 12.)

As they were talking, the officers observed that Defendant had a blanket wrapped around her shoulders with regular clothes underneath. (TR. 10; TR. 32.) Meola testified that Defendant's left arm appeared to be a little out of place, but that really did not concern him. (TR. 32.) Meola stated that he thought Defendant was holding the blanket at her belt line in a way that seemed

---

[3] There was no testimony that the name on the ticket produced by Defendant did not match the one on the suitcase's tag or Defendant's identification.

unnatural, but that this also did not concern him. (TR. 32.) Meola testified that as they were speaking to Defendant, he noticed a straight line off Defendant's left side behind her arm, which he did feel was concerning. (TR. 32.) Meola stated that it was obvious to him that something was there. (TR. 32.) Meola asked Defendant if anyone asked her to bring anything with her. Meola then asked Defendant if she had anything strapped to her body. (Ex. 1.) Defendant responded by saying "no" three times. (Ex. 1.) Meola testified that he felt that Defendant's response of saying "no" three times indicated that she was under stress. (TR. 33.) Meola testified that he did not raise his voice or make any demands of Defendant. (TR. 34.)

After Meola asked Defendant if she was carrying anything, he asked Defendant to open her blanket. (TR. 33.) Defendant responded by turning her back to the officers and opening her blanket. (Ex. 1.) Meola told Defendant "you can face me. You can turn around and face me." (Ex. 1.) Defendant turned around and had her hands at her side, so the blanket was hanging at her sides. (Ex. 1.) Plaintiff was also bent forward at the waist, causing her shirt to hang slightly looser around her body. (Ex. 1.) Meola testified that he could still see the bulge on her left side. (TR. 35.) Meola then grabbed the left side of the blanket and opened it, telling Defendant to "open this up for me." (Ex. 1.) At this point, Defendant lifted both of her arms thereby opening the blanket. Meola told Defendant that she could stand straight up, which Defendant did. (Ex. 1.) Meola testified that the bulge was very pronounced at that point. (TR. 35-36.)

Meola again asked Defendant if she had anything strapped to her body, and then immediately reached out and touched the bulge. (Ex. 1.) It appears from the video of the encounter that Meola was manipulating the bulge. (Ex. 1.) Meola did not ask Defendant what the bulge was at that point. (TR. 39.) Meola did not ask for Defendant's consent to touch her or ask/tell Defendant he was going to conduct a pat-down. (Ex. 1; TR. 39.) Meola testified that when he touched the bulge, it felt like a square kilo brick. (TR. 37.) However, Meola acknowledged at the hearing that the bulge could have been a book. (TR. 41.) Meola testified that his immediate concern was to determine if Defendant possessed a weapon. (TR. 36.) Meola stated that he wanted to make sure the bulge was not a gun or something that could be harmful. (TR. 36.) Meola testified that there is little security at the bus station, and that the station is a "soft target" for terrorism. (TR. 36.) Meola stated that there is increased security at the bus station around September 11, and

4

officers on patrol are looking for security issues that might be a concern. (TR. 37.) Meola testified that typically, around 9-11, the NSP participates in operations with TSA and the U.S. Marshals at train stations and sometimes bus stations, but that these operations did not occur in 2018. (TR. 36-37.)

After touching the bulge, Meola said "let's go 10-15," which is the NSP's code that officers have a prisoner in custody. (TR. 17, 41; Ex. 1.) Meola then placed Defendant in handcuffs and moved her to the administrative area of the bus station. (TR. 37.) Wilkie and Meola testified that once the handcuffs were on Defendant, she was in custody and under arrest. (TR. 17, 37.) Defendant was then taken to the back area of the bus station. (TR. 37.) Once she was arrested and in the back area of the station, Defendant was given her *Miranda* warnings and told by the officers that she could either consent to a search of her person, or that they would request a search warrant. (Ex. 1.) Defendant consented to the search of her person and two bricks of contraband were taken off her body. (TR. 41.) The contraband was field tested and confirmed to be heroin. (TR. 37-38.) The officers also questioned Defendant as she was in the back area of the bus station. (Ex. 1.)

## DISCUSSION

Defendant argues that law enforcement violated her Fourth Amendment right against unlawful search and seizure. "Not every encounter between law enforcement officers and an individual constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988). It is well-established that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking if he is willing to answer some questions, [and] by putting questions to him." *Florida v. Royer*, 460 U.S. 491, 497 (1983). However, a "consensual encounter can escalate into the type of investigatory stop contemplated in *Terry v. Ohio*, 32 U.S. 1, 30 (1968) when the law enforcement officer develops reasonable articulable suspicion of criminal activity." *United States v. 2002 BMW 7451*, No. 8:10CV15, 2010 WL 4609361, at *5 (D. Neb. Nov. 5, 2010).

The standard of articulable justification required by the Fourth Amendment for an investigative seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *United States v. Martin*, 706 F.2d 263, 265 (8th Cir. 1983). "The totality of the circumstances—the whole picture—must be taken into account." *Campbell*, 843 F.2d at 1093 (quotation omitted).

The undersigned finds that the initial encounter between Defendant and law enforcement was consensual. However, it quickly transformed into a "*Terry*-type" investigatory detention requiring a reasonable suspicion that criminal activity may be afoot. *Terry v. Ohio,* 392 U.S. 1 (1968); *United States v. Eustaquio*, 198 F.3d 1068, 1070 (8th Cir. 1999). Also, at the time the handcuffs were placed on Defendant, which occurred approximately two minutes and fifty-three seconds into the encounter, Defendant was undisputedly under arrest. (TR. 17, 37.)

The government argues that Defendant's Fourth Amendment rights were not violated because the contraband was discovered through a pat-down search during a lawful *Terry* stop. During a *Terry* stop, a law enforcement officer may perform a warrantless pat-down search "for the protection of himself or others nearby in order to discover weapons if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous." *United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002). Protective frisks are permissible "when a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) (quotation omitted).

Police officers may seize nonthreatening contraband detected during a pat-down search for weapons so long as the officer's search stays within the bounds marked by *Terry*. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id*. Still, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity *immediately apparent*, there has been no invasion of the

6

suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* at 375 (emphasis added).

The undersigned is highly skeptical that Meola's touching of the bulge on Defendant was actually a pat-down search for weapons. The officers never testified it was a pat-down. At the hearing, the government, in their argument, referred to it as "the fastest protective frisk in law enforcement history." (TR. 45.) The video of the encounter shows that Meola reached out with one hand and only touched the bulge on Defendant's left side. Meola did not frisk the remainder of Defendant's body before placing her in handcuffs. Meola did not ask for Defendant's consent to touch her and did not tell Defendant he was going to conduct a pat-down search. *See United States v. Aquino*, 674 F.3d 918 (8th Cir. 2012) (finding that the officer's act of immediately searching the defendant's body underneath his clothing without his consent, rather than conducting a pat-down, exceeded the permissible scope of *Terry* because an actual search of a person's body is not authorized until a pat-down confirms the presence of a weapon or contraband).

After feeling and manipulating the bulge (as revealed in the video), and before placing Defendant under arrest, the officers did not attempt to remove the item from Defendant's person, which is permissible if it is "immediately apparent" during a pat-down that an item is contraband. *See Dickerson*, 508 U.S. at 378 (finding that the search of the defendant's jacket exceeded scope of *Terry* when the officer determined a lump was contraband only after squeezing, sliding and manipulating the contents of the defendant's pocket). Meola did not even ask Defendant what the bulge was. By Meloa's own admission, he was not entirely certain that the bulge was contraband at the time he placed Defendant under arrest. While he testified that his initial impression was that the bulge was contraband, he acknowledged that the item could have been a book. Thus, Meola's own testimony and actions reveal it was not "immediately apparent" that the item on Defendant's person was contraband. *Dickerson*, 508 U.S. at 375. *See also United States v. Tovar-Valdivia*, 193 F.3d 1025, 1028 n.1 (8th Cir. 1999) (stating that *Terry* does not "authorize the police officer to handcuff and search an individual after the initial pat-down of the bulge [does] not confirm the existence of a weapon or contraband").

7

Even assuming Meola conducted a valid pat-down search during the course of a lawful *Terry* stop, "a *Terry* stop that becomes an arrest must be supported by probable cause." *Aquino, 674 F.3d at 924*. "Probable cause for a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Tovar-Valdivia*, 193 F.3d at 1028 (internal quotation omitted). "In determining whether probable cause exists, [courts] recognize that the police possess specialized law enforcement experience and thus may draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous." *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (internal quotation omitted).

After reviewing the record, and keeping the officers' experience in mind, the undersigned finds that the officers did not have probable cause to arrest Defendant. The officers testified that the following circumstances raised their suspicion as to criminal activity: (1) Defendant was arriving from a source city for narcotics; (2) she had a newer bag that had a tag issued by the bus company with her name on it, but did not have a tag identifying her address or telephone number; (3) her ticket did not match her stated travel plans; (4) she turned away from the officers and bent over when she was asked to open the blanket; (5) her bag indicated it was coming from Denver, but Defendant said she was traveling from Las Vegas; (6) Defendant appeared nervous; and (7) she appeared to have a bulge under her clothing. Decisions from the Eighth Circuit Court of Appeals support the conclusion that taken together, these facts do not provide a reasonable belief that Defendant had committed or was committing an offense.

The facts of this case are remarkably similar to those present in *Tovar-Valdivia*, in which the Eighth Circuit found that an officer did not have probable cause to arrest the defendant, Tovar. In *Tovar-Valdivia*, Tovar was stopped by an interdiction officer after he exited a Greyhound Bus. The officer noticed Tovar because he had exited a bus arriving from a source city, appeared to be in a hurry, and was carrying a new bag. Upon request, Tovar allowed the officer to search his bag, and no contraband was found. As the officer was searching the bag, the officer looked up and saw bulges on the side of Tovar's torso. The officer did not know what the bulges were so the officer

touched the bulges to determine if they were weapons.  After feeling the bulges, the officer only knew they were not part of Tovar's anatomy.  The officer placed Tovar under arrest and handcuffed him.  The officer then, unbuttoned Tovar's shirt, and found narcotics strapped to his body.

The Eighth Circuit found that Tovar was seized and under arrest when he was placed in handcuffs.  The court further concluded that, at the point Tovar was handcuffed, the officer did not have probable cause for arrest.  In so finding, the court emphasized that the officer did not know what the bulges were at the time Tovar was placed under arrest.  The court stated that "[t]he bulges could have been bandages about his body, a money belt worn about his ribs, or any number of non-contraband items." *Id.* at 1028.

Here, probable cause was not present when Defendant was placed under arrest.  As in *Tovar-Valdivia*, after feeling the bulge on Defendant's left-side, the officers did not know for certain that the bulge was contraband.  The officers did not bother to ask Defendant, either before or after touching the bulge, any questions about the bulge to confirm their suspicions.  Instead, they simply placed Defendant under arrest.  The officers had no reason to think that Defendant would not answer additional questions, as she had been cooperative up to that point.

Other factually-similar Eighth Circuit cases likewise support the conclusion that the officers lacked reasonable suspicion or probable cause to detain Defendant.  In *United States v. Jones*, 254 F.3d 692 (8th Cir. 2001), an officer stopped the defendant after the defendant exited a flight from Phoenix.  The officer believed the defendant was suspicious because he (1) came from a drug source city; (2) walked quickly in an abnormal pattern through the airport; (3) turned his head and shoulders to look behind him three separate times; (4) proceeded directly to a tax stand without picking up luggage; (5) had a ticket that had been issued on the day of travel; (6) said he was traveling to visit a cousin, but when asked where his cousin lived, did not respond; (7) was nervous; and (8) had a bulge in front of his waistband.  The officer requested to search the defendant's person and asked him about the bulge at his waist.  The defendant explained that he had just had surgery.  The officer touched the bulge and thought it felt like the packaging of illegal narcotics.  He then arrested the defendant and searched him.  The bulge turned out to be a package of cocaine.  The Eighth Circuit found that the defendant consented to the officer touching him, but

concluded that before the officer touched the bulge on the defendant's midsection, the facts observed by the officer did not even amount to grounds for a reasonable suspicion of wrongdoing.

Moreover, in *United States v. Eustaquio*, 198 F.3d 1068 (8th Cir. 1999), an officer observed the defendant exit a plane and walk directly to a taxi stand, at which point the officer approached her. The officer identified himself as law enforcement and advised the defendant that she did not have to speak to him. The officer asked the defendant about her travel plans and asked if he could search her luggage and jacket. The defendant agreed. The officer then asked the defendant to pull her clothes tight against her upper body. The defendant did the opposite of what the officer asked by pulling her shirt away from her body. Despite this, the officer observed what appeared to be a bulge on the outside of the defendant's body. The officer poked the bulge with his finger and asked the defendant what it was. In response, the defendant jumped back and told the officer that he could not touch her. The officer then told the defendant that he was detaining her and that she must accompany him to the interdiction office at the airport. Once at the office, the officer told the defendant that he was going to apply for a warrant to search her. The defendant told the officer that he did not need to do so and permitted the search of her person.

The government contended that the officer had reasonable suspicion of criminal activity because the defendant (1) was nervous and looked straight ahead; (2) took a direct path to leave the airport terminal; (3) did not have checked luggage; (4) arrived from a source city; (5) made a same-day purchase of a one-way ticket paid for in cash; (6) had no friends or family meeting her at the airport; (7) had a bulge around her midsection; and (8) did the opposite of what the officer asked her to do, by pulling her shirt outward instead of toward her body. The Eighth Circuit determined that these factors describe many people in the traveling public and found that at the time the officer touched the defendant, he did not have reasonable suspicion of criminal activity. The court concluded that the touching of the defendant's person amounted to a Fourth Amendment detention and seizure and was not supported by reasonable suspicion or probable cause.

Here, at the time Defendant was placed under arrest, all the officers knew was that Defendant was arriving from a drug source city; had a newer bag that had a tag with her name on it but did not have a tag identifying her address or telephone number; possessed a ticket that did

10

not match her stated travel plans, even though Meola believed Defendant's explanation of her travel plans; turned away from officers when she was asked to open her blanket; had a bag that indicated it was coming from Denver, even though Defendant said she was traveling from Las Vegas, which Meola believed; appeared nervous; and had a bulge under her clothing. "Too many people fit this description for it to justify a reasonable suspicion of criminal activity." *Eustaquio*, 198 F.3d at 1071. The Eighth Circuit's "prior cases clearly establish an officer's observation of a concealed bulge, without more, does not suffice for probable cause." *Aquino*, 674 F.3d at 927. Under the facts of this case, the officers did not have probable cause to arrest Defendant and the subsequent search of her person revealing the contraband was constitutionally impermissible.

For the reasons explained above, Defendant's arrest was tainted. The subsequent search and discovery of the heroin, as well as Defendant's post-arrest statements, are the fruit of the arrest. Although Defendant was given *Miranda* warnings before making post-arrest statements, this, itself, does not render the statements admissible. *Brown v. Illinois*, 422 U.S. 590, 602 (1975). For the causal chain between an illegal arrest and statements made subsequent thereto to be broken, the statement must be sufficiently an act of free will to purge the primary taint of the illegal arrest. *Id*. Factors considered in making this determination include the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Id*. at 603-04. Having considered each of these factors, the undersigned concludes that the taint of the illegal arrest was not purged. Defendant's statements were made immediately upon her arrest and there was no intervening event of significance between her arrest and her statements. Therefore, both the physical evidence and statements must be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress Evidence (Filing No. 20) be granted.

Dated this 19th day of March, 2019.

11

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.