# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CONNIE ESTRELLA MORENO,<br><br>Defendant. | 8:18CR258<br><br>MEMORANDUM<br>AND ORDER |

This matter is before the Court on defendant Connie Estrella Moreno's ("Moreno") Motion to Suppress Evidence (Filing No. 20). The magistrate judge issued a Findings and Recommendation (Filing No. 35) recommending the motion be granted. The government objects (Filing No. 38) to the findings and recommendation. For the reasons stated below, Moreno's motion to suppress is denied.

I.  **BACKGROUND**

On September 13, 2018, at around 6:00 a.m., Moreno alighted from a bus at the Trailways bus station in Omaha, Nebraska. Moreno soon encountered Nebraska State Patrol ("NSP") Trooper Brandon Wilkie ("Trooper Wilkie") and Sergeant Thomas Meola ("Sergeant Meola" and collectively, the "officers") who were conducting criminal interdiction at the station, looking for criminal activity like illicit weapons and drugs. Trooper Wilkie, a twelve-year veteran, works criminal interdiction weekly. Sergeant Meola has been with the NSP since 1994 and has had training for commercial interdiction. Before being assigned to the Investigative Services Division in 2011, Sergeant Meola served five years on the Federal Bureau of Investigation's joint-terrorism task force and has had counter-terrorism training. He now supervises the Drug Enforcement Agency Task Force in Omaha, working interdiction at transportation hubs. His unit handles eighty to one hundred cases per year.

The officers first contacted Moreno in the passenger-loading area at the bus station. Moreno was wearing what Trooper Wilkie described as "a larger blanketed jacket" over her shoulders with regular clothes underneath. The officers were in plain clothes and had their firearms concealed. Sergeant Meola had a body camera on his left shoulder.

Moreno came to the officers' attention when she claimed ownership of a black suitcase removed from the baggage compartment of a bus that arrived from Denver and was destined for Chicago. The bag caught Sergeant Meola's eye because it was new and only had one tag when bags typically have two—one from the bus line and one personal one. The bag did not have a personal tag containing certain identifying information the officer thought a typical passenger would include to ensure the bag could be recovered if lost or stolen. Trooper Wilkie also found the bag suspicious. The officers noted the only tag on the bag had what appeared to be a fabricated phone number comprised of all the same digits. The officers testified they have seen people involved in criminal activity put limited or false information on a baggage tag, so the bag cannot be connected to them.

As the passengers began boarding the bus for Chicago, Trooper Wilkie asked them if the bag belonged to them. Moreno approached the door and told him the bag was hers. After he identified himself as a trooper and told Moreno why the officers were at the station, Trooper Wilkie asked Moreno about her travel plans and asked to see her ticket. He did not raise his voice, block her ability to move, or tell her she had to stay. At the same time, he did not tell her she did not have to talk to him and was free to leave.

Moreno produced her ticket, explaining she was travelling from Las Vegas to New York. Her name matched the name on the tag. Trooper Wilkie asked for permission to search Moreno's bags because when she handed him her ticket "her hands were visibly shaking." He also noted that she was travelling from a distribution hub for narcotics and that "her ticket did not match her travel, coming from Denver to Chicago." Moreno consented to the search of her bags.

2

As Trooper Wilkie began to search Moreno's bags, Sergeant Meola approached Moreno and joined the conversation. Like Trooper Wilkie, Sergeant Meola suspected possible criminal activity because Moreno said she was leaving Las Vegas, but her bag indicated it was coming from Denver. He explained to Moreno it was unusual that her bag was not checked all the way to her destination, requiring her to retrieve her bag at every stop and make sure it got back on the bus. Sergeant Meola testified he frequently sees people caught smuggling contraband check their bags at every stop despite the added difficulty so they "can keep the bag in their possession and not let it out of their sight."

As Sergeant Meola spoke with Moreno, he noticed her left arm was out of place and "she was holding her blanket at her belt line in a way that" did not seem natural. He was not too concerned until he noticed "a very straight line off [Moreno's] left side behind her arm." It then became "obvious that there was something there." That concerned him because it could have been a weapon or a bomb. Sergeant Meola testified that, based on his counterterrorism training, he was on heightened alert because it was close to the anniversary of the September 11 attacks and the bus station was a soft target for terrorism because of the lack of security there.

Sergeant Meola asked Moreno if anyone asked her to bring anything with her and if she had anything strapped to her body. Moreno said "no" three times. Sergeant Meola noted that her answer to that question was different than her previous answers, suggesting she was under stress. "[S]he was a little more animated in her response and . . . shifted her weight a little bit," he testified. Sergeant Meola explained he has seen similar behavioral changes and increases in stress when he asks questions about possible criminal activity.

Sergeant Meola then asked Moreno if she would mind opening her blanket. He did not raise his voice or make any demands. Moreno responded by turning her back to him and slightly extending her arms out from each side. Sergeant Meola found that odd. He told her she could turn around and face him, which she did, lowering her arms to her side,

3

and leaving the blanket open in front. When Moreno turned to face Sergeant Meola, she leaned forward at the waist, causing her shirt to hang "down loose off her body." Sergeant Meola "could still see . . . a definite bulge on her left side where [he] had seen the original straight line underneath the blanket." He took hold of the edge of the blanket hanging loose on Moreno's left side and said, "Open this up for me." Moreno lifted both arms, opening the blanket further. Sergeant Meola then told Moreno she could stand straight up. When she did, he could see the "pronounced" outline of something under her shirt. Sergeant Meola testified he was concerned Moreno might be concealing a weapon.

Sergeant Meola again asked if Moreno had anything strapped to her body but did not ask her what was causing the bulge. She said no. Without asking Moreno's permission, Sergeant Meola reached out and touched the bulge "to make sure it wasn't a weapon or . . . a bomb, or something like that." When he touched the bulge, it felt like a "kilo-size brick" based on his prior experience. He immediately placed Moreno in handcuffs and took her into custody. On cross-examination at the suppression hearing, Sergeant Meola agreed that "prior to [his] touching the bulge" what he saw could "perhaps" have been a book.

The officers moved Moreno to an administrative area and advised her of her rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The officers told Moreno she could consent to a search of her person or wait for them to get a warrant. Moreno consented to the search, and the officers found two large bricks of heroin. Moreno also agreed to talk with the officers about the drugs they found, telling them she agreed to transport the drugs to Chicago because she needed money. Moreno told the officers she strapped the bricks to her body shortly before encountering them. Before that, the drugs were in her bag.

On September 18, 2018, Moreno was charged with possessing with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. § 841(a)(1) and (b)(1). Moreno moves to suppress "all evidence obtained as a result of the illegal stop, arrest and search of her person on September 13, 2018."

4

## II. DISCUSSION

### A. Standard of Review

Title 28, section 636(b)(1)(B) authorizes the Court to "designate a magistrate judge to conduct" an evidentiary hearing and submit "proposed findings of fact and recommendations for the disposition" of a motion to suppress evidence in a criminal case. When, as here, a party timely objects to the magistrate judge's findings and recommendation, the Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made" and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* § 636(b)(1); *accord* Fed. R. Crim. P. 59(b)(3).

### B. Search and Seizure

The Fourth Amendment protects the people "against unreasonable searches and seizures" by the government. U.S. Const. amend. IV; *United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012). But "[n]ot every encounter between law enforcement officers and an individual constitutes a seizure within the meaning of the [F]ourth [A]mendment." *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988); *accord United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) ("The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976))).

"Police officers are, of course, always free to approach citizens and question them if they are willing to stay and listen." *United States v. O'Neal*, 17 F.3d 239, 242 (8th Cir. 1994) (citing *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*,

499 U.S. 621, 628 (1991)). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [the Court] conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

"[A]n initially consensual encounter can ripen into a seizure requiring reasonable suspicion or probable cause." *Campbell*, 843 F.2d at 1092. As a consensual encounter progresses, a police officer may act in some way to restrain a person's liberty and prevent her from walking away. *See id.; accord Mendenhall*, 446 U.S. at 554. Or a citizen's behavior and the surrounding circumstances may give rise to "a reasonable fear of harm . . . sufficient to justify a seizure for a short period of time, in order to conduct a [protective] pat-down search."[1] *United States v. Ellis*, 501 F.3d 958, 961 (8th Cir. 2007); *accord United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000) ("The danger to officer safety that justifies a protective search may arise after a consensual encounter or investigative stop has commenced."). A protective frisk does not necessarily transform a consensual encounter into an investigatory stop. *See Davis*, 202 F.3d at 1062-63.

Applying these principles to the facts of this case, the Court finds Moreno's encounter with the officers was consensual until Sergeant Meola, without Moreno's consent, initiated a protective frisk by touching Moreno's outer clothing and the bulge he saw under her shirt.[2] At that point, the encounter became "a search and a seizure for Fourth Amendment purposes," requiring reasonable suspicion for the frisk. *Gray*, 213 F.3d at 1000. When Sergeant Meola handcuffed Moreno and moved her to the back of the station,

---

[1] A pat down for weapons is also often referred to as a protective "frisk." *Terry*, 392 U.S. at 12; *accord United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000).

[2] Before that, the officers had simply approached Moreno in a public place in a non-threatening manner and asked to talk to her. The officers used no "physical force or show of authority" to restrain her liberty and did not block her path. *Terry*, 392 U.S. at 20. "[T]he tone of the entire exchange was cooperative." *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996). She readily agreed to stay and answer their questions and promptly consented to a search of her bags. Moreno was not seized under those circumstances. *See, e.g., United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001) ("A Fourth Amendment 'seizure' does not occur merely because a police officer requests permission to search an area or poses other questions to a citizen.").

6

she was admittedly under arrest—which, in this case, required probable cause. *See*, *e.g.*, *Ross v. City of Jackson*, 897 F.3d 916, 920 (8th Cir. 2018) ("[A] constitutional violation occurs when there is a warrantless arrest that is not supported by probable cause to believe that a crime has been committed."). The key questions, then, are whether Sergeant Meola had reasonable suspicion to frisk Moreno and probable cause to arrest her. The Court concludes he did.

### 1. Reasonable Suspicion to Frisk

A protective frisk is "justified by a concern for the safety of the searching officer and others nearby." *United States v. Dortch*, 868 F.3d 674, 678 (8th Cir. 2017). An officer involved in a consensual encounter may conduct a protective frisk for weapons if he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30; *see also United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011). "[T]he validity of a protective search 'does not depend upon the searching officer actually fearing the suspect is dangerous; rather, such a search is valid if a hypothetical officer in the same circumstances could reasonably believe the suspect is dangerous.'" *United States v. Plummer*, 409 F.3d 906, 909 (8th Cir. 2005) (quoting *United States v. Rowland*, 341 F.3d 774, 783 (8th Cir. 2003)).

"[T]he Fourth Amendment inquiry as to whether a protective frisk was reasonable must focus on the circumstances confronting the officer when he made the decision to frisk." *Davis*, 202 F.3d at 1063. "[A]n individual's actions during a consensual encounter may both crystallize previously unconfirmed suspicions of criminal activity and give rise to legitimate concerns for officer safety." *Id*. In deciding whether reasonable suspicion exists, the Court is "not guided by a 'neat set of legal rules.'" *United States v. Bailey*, 417 F.3d 873, 876-77 (8th Cir. 2005) (quoting *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996)). Instead, the Court must "consider the totality of the circumstances in light of the officers' experience and specialized training," *Preston*, 685 F.3d at 689 (quoting *United*

7

*States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006)), to determine "if the officer conducting the search had a 'particularized and objective basis for suspecting legal wrongdoing,'" *Bailey*, 417 F.3d at 877 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). The Court also considers "those inferences and deductions made by officers under the particular circumstances, since law enforcement officials are 'trained to cull significance from behavior that would appear innocent to the untrained observer.'" *Id.* at 877 (quoting *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987)).

"Under this objective standard, the 'officer need not be absolutely certain that" an individual is armed and dangerous, *United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002) (quoting *Terry*, 392 U.S. at 27), or that she is probably committing a crime, *see United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006). But he must have "some minimal level of objective justification" for his actions. *INS v. Delgado*, 466 U.S. 210, 217 (1984). "To be reasonable, suspicion must be based on 'specific and articulable facts' that are 'taken together with rational inferences from those facts'—that is, something more than an 'inchoate and unparticularized suspicion or "hunch."'" *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) (quoting *Terry*, 392 U.S. at 21, 27)).

Although the Eighth Circuit has observed "conduct typical of a broad category of innocent people provides a weak basis for suspicion," *United States v. Crawford*, 891 F.2d 680, 681 (8th Cir. 1989), "[f]actors consistent with innocent travel, when taken together, can give rise to reasonable suspicion, even though some travelers exhibiting those factors will be innocent," *Carpenter*, 462 F.3d at 986; *accord United States v. Sokolow*, 490 U.S. 1, 9-10 (1989) (noting wholly lawful conduct and innocent behavior can establish reasonable suspicion). "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Sokolow*, 490 U.S. at 10 (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44, n.13 (1983)). "The behavior on which reasonable suspicion is grounded, therefore, need not . . . eliminate innocent interpretations of the circumstances." *Carpenter*, 462 F.3d at 986; *accord Bailey*,

417 F.3d at 878 ("[A] combination of innocent conduct can provide officers with reasonable suspicion of criminal activity.").

In this case, the government contends the totality of the circumstances surrounding the officers' encounter with Moreno reasonably justified a brief pat-down search to ensure she was not armed and dangerous. *See Terry*, 392 U.S. at 29-31. In particular, the government emphasizes that Moreno arrived at the bus station from a source city for drugs, reported travel plans that did not match her ticket and luggage, was checking her bag at every stop, did not have a personal tag on her luggage with identifying information, had what appeared to be a fabricated phone number on the bus company's tag, was nervous and visibly shaking, showed increased signs of stress when asked about criminal activity, seemed to be hiding something under her clothing, evasively turned away when asked to open her blanket, bent over when she turned back around to further conceal the bulge under her clothes, and repeatedly denied carrying anything on her body when Sergeant Meola could clearly see a large, distinct bulge.

The government also notes the encounter occurred at a "soft target" for terrorism—a bus station with very little security—just days after the anniversary of the September 11 attacks, which heightened the risk of terroristic activity. The officers testified that, based on their training and experience, Moreno's behavior and the surrounding circumstances caused them to suspect possible criminal activity and that she might be carrying a weapon or a bomb. In the government's view, Sergeant Meola's brief touching of "the brick of drugs strapped to [Moreno's] body" was properly limited "to what was immediately a potential source of a threat" and not a general search for criminal activity. *See id.*

Moreno sees things a little differently. Moreno contends her encounter with the officers "quickly transformed into a seizure" and the officers did not have reasonable suspicion to stop or frisk her. In support, Moreno summarily relies on a series of Eighth Circuit cases involving concealed bulges that she contends match this case "exactly" and

require the Court to suppress the evidence against her. *See, e.g.*, *United States v. Aquino*, 674 F.3d 918, 924-25 (8th Cir. 2012); *United States v. Jones*, 254 F.3d 692 (8th Cir. 2001); *United States v. Eustaquio*, 198 F.3d 1068, 1070-71 (8th Cir. 1999); *United States v. Tovar-Valdivia*, 193 F.3d 1025 (8th Cir. 1999).

While the Court agrees those cases provide valuable guidance in deciding her motion to suppress, it is not persuaded they compel suppression under the totality of the circumstances in this case. *See, e.g.*, *Roggeman*, 279 F.3d at 578 ("Reasonable suspicion is not a 'finely-tuned' or bright-line standard; each case involving a determination of reasonable suspicion must be decided on its own facts." (quoting *Ornelas*, 517 U.S. at 696).

The Supreme Court and Eighth Circuit have cautioned that the nature of the reasonable-suspicion inquiry reduces the value of prior decisions as precedent. *See Arvizu*, 534 U.S. at 276. "As the Supreme Court has explained, 'because the mosaic which is analyzed for a reasonable-suspicion . . . inquiry is multi-faceted, one determination will seldom be a useful precedent for another.'" *Dortch*, 868 F.3d at 681 (alteration in original) (quoting *Ornelas*, 517 U.S. at 698). "In the context of a 'commonsense, nontechnical' standard like 'reasonable suspicion,' which must be evaluated in light of the whole mass of facts and circumstances present in a given situation, it is natural for cases that resemble each other in certain ways or at a high level of generality to come out differently as a result of key details that weigh differently in one than in the other." *Id.* (quoting *Ornelas*, 517 U.S. at 695). Such is the case here. Moreno's cited cases are similar in some ways but differ in other key details that alter the outcome.

Take *Aquino*, the case Moreno quoted at the evidentiary hearing and contends is "exactly like" this case. 674 F.3d at 923. In *Aquino*, law-enforcement officers working interdiction at the bus station in Omaha watched a passenger in the terminal and contacted him just after he boarded a bus. *Id.* at 921. After answering some questions about his travel itinerary and showing the officers his ticket and identification, the passenger agreed

to exit the bus and show the officers his bag. *Id.* After the passenger located his bag, one officer asked if he could search both the bag and the passenger. *Id.*

The passenger consented to the search of his bag but not to a pat down of his person. *Id.* The officer then asked him to "unzip his coat and hold his clothing next to his body so that [the officer] could tell if there was anything secured under his clothing." *Id.* He complied, and the officer saw "nothing unusual." *Id.* When asked to do the same thing to his "baggy jeans," the passenger pulled the jeans tight on his thighs but not his lower legs. *Id.* He also appeared "very nervous and fidgety." *Id.* The officer again asked the passenger to pull his jeans tight around his calves and ankles, which he did half-heartedly. *Id.*

At that point, the officer "noticed an unnatural bulge on the inside of [the passenger's] right calf." *Id.* The officer asked him to raise his pantleg, but he refused. *Id.* The officer then placed the passenger in handcuffs "as a precautionary safety measure." *Id.* "Without first conducting a pat down, [the officer] immediately lifted [the passenger's] pant leg above the bulge and saw a duct-taped bundle strapped on [his] right leg." *Id.* Believing "the now-revealed bundle contained a controlled substance," the officer moved the passenger to the office "of the bus terminal and advised of his Miranda rights." *Id.*

Charged with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1), the passenger pled not guilty and moved to suppress the evidence found during his encounter at the bus station. *Id.* at 922. The trial court granted the motion, and the government appealed. *Id.*

On appeal, the Eighth Circuit decided the evidence was properly suppressed. *Id.* at 923. Concluding the case turned on the officer's "first act after placing [the passenger] in handcuffs, which was to lift [his] pant leg to reveal the concealed bulge," the Eighth Circuit held "[u]nder the circumstances involved in this case, [the officer] violated the Fourth Amendment when he searched underneath an article of [the passenger's] clothing without

his consent and without probable cause to do so, instead of performing a pat down to confirm whether the concealed bulge was a weapon."[3] *Id.*

In other words, the Eighth Circuit faulted the officer in *Aquino* for failing to do precisely what Sergeant Meola did in this case—performing a protective frisk to determine whether the obvious bulge under Moreno's clothing was a weapon. *Id.*

Explaining its holding in *Aquino*, the Eighth Circuit noted that "[a]n actual search of a person's body is not authorized under *Terry* until *after* a pat down confirms the presence of a weapon or contraband." *Id.* at 925. The Eighth Circuit decided the investigating officer's "act of immediately searching [the passenger's] body underneath his clothing, rather than conducting a" less-intrusive pat down to determine if the concealed bulge on the passenger's leg was a weapon "exceeded the permissible scope of *Terry*," requiring the court to analyze the officer's "conduct in handcuffing [the passenger] and searching under his clothing . . . as an arrest which required probable cause, rather than as an investigatory detention which required reasonable suspicion." *Id.* at 927.

This Court finds no basis for analyzing Sergeant Meola's protective frisk of Moreno as an arrest. Unlike the officer in *Aquino*, Sergeant Meola did not skip the pat down and perform a more-intrusive body search. He conducted a targeted protective frisk for weapons that was properly limited in scope based on his observation of the concealed bulge under Moreno's clothing. For that search, he needed only reasonable suspicion, not probable cause. *Id.*; *accord Terry*, 392 U.S. at 30.

Moreno denies Sergeant Meola conducted a pat down. Asserting "[t]he facts of *Aquino* completely match up with" this case, Moreno seems to suggest that Sergeant Meola touching Moreno's open blanket and reaching his hand slightly inside the left edge of the

---

[3]Inherent in the Eighth Circuit's reasoning in *Aquino* is the conclusion that the officer's actions in that case before the unauthorized body search did not violate the passenger's Fourth Amendment rights.

blanket to touch the bulge through Moreno's shirt equates to the officer in *Aquino* lifting up the passenger's pant leg to expose his skin and visually examine what was causing the bulge. The argument is unpersuasive.

Moreno's argument "rests on the erroneous legal premise that a pat down is the only permissible way to conduct a *Terry* frisk." *United States v. Hawkins*, 830 F.3d 742, 745 (8th Cir. 2016). "Though a pat-down is often the least intrusive way to search for a hidden firearm, concern for officer safety may justify lifting clothing or even reaching directly for a weapon in a waistband." *Id.*

Even if reaching slightly inside Moreno's blanket was more than a pat down, Sergeant Meola's targeted frisk was not, under the circumstances, overly intrusive. Rather, it was properly confined to the bulge and "reasonably designed to discover concealed weapons." *Roggeman*, 279 F.3d at 577. Sergeant Meola neither reached under Moreno's clothing, *Aquino*, 674 F.3d at 925 ("Searching under articles of clothing, whether it be a man's pant leg or a woman's blouse, is necessarily more intrusive than a pat down."), nor otherwise invaded Moreno's "person beyond the outer surfaces of [her] clothes." *Terry*, 392 U.S. at 30. He only touched her outer clothing and never exposed her skin or undergarments. Sergeant Meola's targeted frisk—narrowly limited to Moreno's outer clothing—did not exceed the scope of *Terry*. *Id.*

*Aquino* does not compel suppression in this case.

Moreno's remaining cases are likewise distinguishable. The thrust of those cases was "that the mere observation of a non-anatomical bulge on someone's person was, without additional information, insufficient to provide probable cause that contraband would be found in the bulge." *United States v. Guevara*, 731 F.3d 824, 832 (8th Cir. 2013); *see also Aquino*, 674 F.3d at 925. That is not the issue here, and the Court's review of those cases does not convince the Court that Moreno's encounter with the officers violated her constitutional rights.

In *Eustaquio*, the same investigating officer from *Aquino* initiated contact with a recently arrived airline passenger at a taxi stand. 198 F.3d at 1069. The passenger answered the officer's questions, allowed him to search her luggage, and consented to him searching her jacket. *Id.* at 1069-70. The officer found nothing. *Id.* at 1070. Still suspicious, the officer asked the passenger to pull her clothes tight against her body. *Id.* She did the opposite, but the officer still "saw what appeared to be a line or a bulge just to the outside of her body." *Id.* The officer "'reflexively' reached out and poked the observed bulge with his finger, and asked what it was." *Id.* The passenger "jumped back, and told [the officer] that he could not touch her." *Id.* The officer detained the passenger and took her to the interdiction office at the airport where the passenger eventually "produced a package from beneath her corset containing 500 grams of powder cocaine." *Id.*

In resisting the passenger's motion to suppress, the government offered "the following as grounds for reasonable suspicion of criminal activity: (1) defendant's exhibiting nervous movement and a straight-ahead gaze; (2) defendant's choice of a direct path to leave the terminal; (3) defendant's not having any checked luggage; (4) defendant's arrival from a source city for narcotics trafficking; (5) defendant's same-day purchase of a one-way airline ticket with cash; . . . (6) the fact that there were no friends and family meeting defendant at the airport[;] . . . (7) defendant's doing the opposite of what [the officer] asked, and pulling her shirt outward instead of toward her body; and (8) any bulge that [the officer] might have seen." *Id.* at 1070-71. The Eighth Circuit held "that at the point that [the officer] reached out to touch [the passenger's] midsection, he did not have a reasonable suspicion based on articulable facts of any criminal activity." *Id.* at 1071.

The Eighth Circuit found the case similar to *Tovar-Valdivia*, in which it had recently decided in similar circumstances that "officers did not have probable cause to arrest [a man] in a bus station when he appeared to be in a hurry, carried a new bag, arrived from a source city for narcotics, and had observable bulges under his shirt." *Id.* at 1071. In *Tovar-Valdivia*, the investigating officer testified he touched the bulges "to determine whether

14

they were weapons" but "that after touching [them] . . . still did not know what the bulges were; all he knew was that they were not a part of [the man's] anatomy." 193 F.3d at 1028. The officer arrested the man anyway. *Id.* Noting "[t]he bulges could have been bandages about his body, a money belt worn about his ribs, or any number of non-contraband items," the Eighth Circuit concluded "[t]he officer's equivocal testimony clearly establishes the invalidity of the arrest for want of probable cause."[4] *Id.*

The last case Moreno cites in support of her motion to suppress, *Jones*, 254 F.3d at 697-98, again involves the same investigating officer in *Aquino* and draws on the reasoning in *Eustaquio* and *Tovar-Valdivia*. In *Jones*, the officer again encountered the suspect at an airport taxi stand. 254 F.3d at 694. As the officer spoke with the suspect, he noticed a bulge in the front of the suspect's waistband, which he suspected to be contraband. *Id.* With the suspect's consent, the officer reached out and touched the bulge and thought it felt like the packaging for drugs. *Id.* The bulge turned out to be cocaine. *Id.*

Over a vigorous dissent, the panel majority concluded that before the officer touched the bulge, "the facts he had observed"—the suspect "walking around the phone bank, looking behind him, traveling without luggage, and arriving from Los Angeles," a source city for drugs—"did not amount even to grounds for a reasonable suspicion of wrongdoing." *Id.* at 697. In reaching that conclusion, the majority explained the case was close and, like *Eustaquio* and *Tovar-Valdivia*, "depend[ed] on its particular facts." *Id.* at 698. The dissent noted the officer's experience with drug interdiction, catalogued the

---

[4]In in a footnote in *Tovar-Valdivia*, the Eighth Circuit, without much analysis, rejected the government's argument that the encounter was a *Terry* stop and that the officer was conducting a valid protective frisk when he discovered the contraband. 193 F.3d at 1028 n.1. The Eighth Circuit decided "[t]he government's position [wa]s unsustainable" because "*Terry* does not authorize a pat-down for weapons after search of the bag dispelled the officer's reasonable suspicion; nor does *Terry* authorize the police officer to handcuff and search an individual after the initial pat-down of the bulge did not confirm the existence of a weapon or contraband." *Id.* Neither of those circumstances is present here.

15

factors that raised the officer's suspicions of drug trafficking, and concluded the combined factors amounted to reasonable suspicion. *Id.* at 698-99 (McGill, J., dissenting).

"Notwithstanding the broad similarities" between Moreno's cited cases and this one, the Court "discern[s] several factual differences" and key details "that together call for a different result." *Dortch*, 868 F.3d at 679-80. For example, the officer's reflexive search in *Eustaquio* was not a protective frisk based on safety concerns, and the case did not involve facts leading to a reasonable suspicion that the passenger was armed. 198 F.3d at 1070-71. The Eighth Circuit also noted that unlike Sergeant Meola, prior to touching the passenger's "midsection, the officers could not visually detect anything other than the presence of a corset on [her] person." *Id.* at 1071.

The consensual search in *Jones* likewise did not involve a protective frisk. 254 F.3d at 696-97. The Eighth Circuit did briefly address the government's argument that the officer had reasonable suspicion for a protective frisk in *Tovar-Valdivia*, but, as noted above, its decision was based on factors that do not apply here. 193 F.3d at 1028 n.1. The officer in *Tovar-Valdivia* also testified that after touching the bulges, he could still not tell what they were. *Id.* at 1028. In contrast, Sergeant Meola immediately identified Moreno's bulge as contraband when he touched it.

But the primary difference between this case and Moreno's cited cases is the stronger and more particularized combination of factors—objectively viewed as a whole—to support a brief protective frisk of Moreno. Having carefully considered the totality of the circumstances in this case and given due weight to the rational inferences and deductions drawn by Sergeant Meola and Trooper Wilkie in light of their extensive experience and training, the Court finds that at the time he conducted the protective frisk of Moreno, Sergeant Meola could reasonably suspect that she was engaged in criminal activity and was "armed and presently dangerous." *Terry*, 392 U.S. at 30.

As the government points out, the officers described in detail at the suppression hearing why, in view of the circumstances, Moreno's bag, travel plans, and nervous behavior suggested possible criminal activity based on their training and extensive experience with the "modes or patterns of operation of certain kinds of lawbreakers." *United States v. Cortez*, 449 U.S. 411, 418 (1981). As the conversation went on, Moreno's behavior did not dispel the officers' suspicions; it heightened them. *See, e.g.*, *Davis*, 202 F.3d at 1063 ("[A]n individual's actions during a consensual encounter may both crystallize previously unconfirmed suspicions of criminal activity and give rise to legitimate concerns for officer safety.").

Moreno was wearing a blanket "that made it hard to see if [s]he was armed," *Dortch*, 868 F.3d at 680, but as Sergeant Meola asked Moreno about her travel plans, he still noticed a large, distinct bulge under her clothing that he suspected could be a weapon. Although observing a concealed bulge, by itself, is not enough in this circuit to establish reasonable suspicion,[5] *see, e.g.*, *Aquino*, 674 F.3d at 924, an officer's observation of a bulge is "a substantial factor" in "determining whether the totality of the circumstances g[i]ve rise to reasonable suspicion justifying a protective *Terry* search," *Roggeman*, 279 F.3d at 579.

Indeed, in *Pennsylvania v. Mimms*, the Supreme Court concluded that once officers observed a bulge in a man's jacket "there [wa]s little question the officer was justified" in conducting a protective "pat down" because "[t]he bulge in the jacket permitted the officer to conclude that [the man] was armed and thus posed a serious and present danger to the safety of the officer," even though "the officer had no reason to suspect foul play from the [man] at the time of the stop." 434 U.S. 106, 109, 111-12 (1977) (per curiam) (finding the search reasonable under the Fourth Amendment); *accord United States v. Chartier*, 772

---

[5]As the Eighth Circuit noted in *Roggeman*, other courts have found that the "unusual shape, size, and position of bulge on [a] suspect's person 'alone provided not only reasonable suspicion but also probable cause' for his arrest." 279 F.3d at 579 (quoting *United States v. Elsoffer*, 671 F.2d 1294, 1299 (11th Cir. 1982)).

F.3d 539, 545 (8th Cir. 2014) (deciding that a bulge in a suspect's coat pocket "could have indicated the presence of a weapon"); *Roggeman*, 279 F.3d at 579 (same).

Upon seeing the bulge, Sergeant Meola asked Moreno if she had anything strapped to her body and she got more nervous. When asked to open her blanket, Moreno turned away from Sergeant Meola to do so. That evasive action was "unusual conduct" to say the least. *Terry*, 392 U.S. at 30; *accord United States v. Diriye*, 818 F.3d 767, 769 (8th Cir. 2016) (concluding reasonable suspicion existed where an officer patted down a suspect who "appeared to be continuously turning his body to keep his right side away from" the officer). Even without specialized training, a parent who finds their child near a cookie jar with a bulge under their blanket would reasonably suspect wrongdoing if the child, when asked to open the blanket, turned around to do so. *See*, *e.g.*, *Cortez*, 449 U.S. at 418 (explaining reasonable suspicion deals with probabilities, not "hard certainties" and police officers are permitted to form "certain common sense conclusions about human behavior").

At the officer's request, Moreno then turned to face him, but she lowered her arms and leaned forward, again apparently trying to conceal the bulge. *See Diriye*, 818 F.3d at 769. Given the surrounding circumstances, Moreno's ongoing evasive action and efforts to conceal the obvious bulge under her clothing justified a limited protective frisk. *See*, *e.g.*, *Dortch*, 868 F.3d at 680 (finding a suspect's ongoing efforts to conceal what he might have had under his coat "added to and reinforced" the officer's reasonable suspicion).

At the point he reached out to touch the obvious bulge under Moreno's clothing, Sergeant Meola had far more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. The frisk did not violate Moreno's Fourth Amendment rights. *Id.*

2. **Probable Cause to Arrest**

Then next question—whether Sergeant Meola had probable cause to arrest Moreno after touching the bulge—is much easier. "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately

18

apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons."[6] *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). That means an officer who discovers contraband during a valid protective frisk need not "ignore the contraband, and the Fourth Amendment does not require its suppression." *Michigan v. Long*, 463 U.S. 1032, 1050 (1983). If the officer reasonably "believes she feels drugs or a weapon, the officer may have probable cause to arrest." *Guevara*, 731 F.3d at 832 (noting the Eighth Circuit has upheld probable-cause findings where the officer "form[ed] a reasonable belief about what is in the bulge" after touching it); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994) ("[A]n officer may seize an object discovered in a pat-down search if the object's incriminating character is immediately apparent to the officer's touch.").

Here, Sergeant Meola was conducting a lawful, targeted search for weapons when he touched the bulge under Moreno's clothing. Sergeant Meola credibly testified that based on his experience, he immediately identified the bulge on touch as a square, kilo-size brick of drugs.[7] On the facts in this case, the Court finds Sergeant Meola had probable cause to arrest Moreno. *cf. United States v. Favela*, 247 F.3d 838, 840 (8th Cir. 2001) (concluding an officer's consensual touching of a bulge under the defendant's shirt that led the officer to believe the bulge was illegal drugs provided probable cause for the defendant's arrest); *Craft*, 30 F.3d at 1045 (affirming the denial of a motion to suppress where an officer "testified that it became immediately apparent to him when he felt the

---

[6] In this context, the phrase "immediately apparent" means the officer has "probable cause to believe an item is incriminating." *United States v. Green*, 560 F.3d 853, 858 (8th Cir. 2009). "Probable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.'" *United States v. Garner*, 907 F.2d 60, 62 (8th Cir. 1990) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion)).

[7] Sergeant's Meola's testimony on cross-examination that *before* he touched the brick, it was possible the bulge he perceived under Moreno's clothes could "perhaps" have been caused by a book does not undermine his unequivocal testimony that *upon touch*, he identified the hidden object as contraband.

bulges on [the defendant's] ankles that the bulges were packages of controlled substances").

## III. CONCLUSION

Based on the totality of the circumstances that developed during his consensual encounter with Moreno, Sergeant Meola had an objectively reasonable, articulable suspicion that the bulge he observed under Moreno's clothing could have been a weapon. Acting on that reasonable suspicion, Sergeant Meola conducted a targeted protective frisk by touching the bulge. Upon touching the bulge and reasonably identifying it as contraband, Sergeant Meola had probable cause to arrest Moreno and seize the drugs strapped to her body. Accordingly, Sergeant Meola's conduct did not violate Moreno's constitutional rights.

Based on the foregoing,

IT IS ORDERED:
1. The government's objections (Filing No. 38) to the magistrate judge's Findings and Recommendation are sustained.
2. The Findings and Recommendation (Filing No. 35) are rejected.
3. Defendant Connie Estrella Moreno's Motion to Suppress Evidence (Filing No. 20) is denied.

Dated this 24th day of April 2019.

BY THE COURT:

Robert F. Rossiter, Jr.
United States District Judge